**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **DAIRYLAND PRODUCE LLC,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | CIVIL ACTION NO. _____ |
| | § | |
| **ANTHONY SMITH and** | § | |
| **FLORIDA VEG INVESTMENTS LLC** | § | |
| **dba MR GREENS PRODUCE,** | § | |
| | § | |
| *Defendants*. | § | |

---

### PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIONS

---

Plaintiff Dairyland Produce LLC ("**Dairyland**") files this Verified Original Complaint and Application for Temporary Restraining Order and Preliminary and Permanent Injunctions ("Complaint") against Defendants Anthony Smith ("**Smith**") and Florida Veg Investments LLC dba Mr Greens Produce ("Mr Greens") (together, "**Defendants**"). In support of this Complaint, Dairyland includes the declarations attached as Exhibits 1-3.

## I.     INTRODUCTION

1.      Dairyland operates a national wholesale food distribution business. Exhibit 1 (Bryan Declaration) ¶ 3.

2.      Dairyland's parent company, The Chefs' Warehouse, Inc. acquired Smith's former employer, Hardie's Fruit and Vegetable Company, LP ("**Hardie's**"), on March 20, 2023 (the "**Acquisition**"). *Id.*

3.      At the time of the Acquisition, Smith was the Director of Sales for Texas at Hardie's. Exhibit 2 (Munoz Declaration) ¶¶ 4-6. Following the Acquisition, Smith became the

Director of Sales for Dairyland, responsible for overseeing sales throughout the State of Texas. Ex. 1 at ¶ 6. As the Director of Sales, Smith was responsible for every customer and every salesperson in his territory, and was the hiring manager for all sales personnel in his region. *Id.*

4.       Effective September 14, 2023, Smith became a Sales Manager for Dairyland, reporting to Regional Vice President Ethan Bryan. *Id.* at ¶ 7; Ex. 2 at ¶ 7. As a Sales Manager, Smith received higher annualized compensation as compared to his Director of Sales role (taking into account his variable compensation) and had responsibility over the Dallas/Fort Worth metroplex, east Texas, and McAllen, Texas. Ex. 1 at ¶ 7; Ex. 2 at ¶ 8.

5.       As Dairyland's Director of Sales and as its Sales Manager, Smith directly interacted on a day-to-day basis with Dairyland's customers. Ex. 1 at ¶ 8. Smith was responsible for maintaining these valuable customer relationships, and in many way was "the face" of Dairyland to those customers. *Id.* Smith also had the most knowledge of any sales team member regarding Dairyland's Texas customers, salespersons, pricing, commissions, profit margins, and areas of strength and weakness. *Id.*

6.        When he became an employee of Dairyland, Smith signed a Confidentiality, Non-Solicitation, Non-Interference, and Non-Competition Agreement with Dairyland, effective March 20, 2023 (the "**Agreement**"). Ex. 2 at ¶ 9; *id.* at Exhibit A. Smith also acknowledged Dairyland's Employee Handbook policies.

7.       On Monday, March 11, 2024, Smith unexpectedly notified Dairyland of his intention to resign effective March 25, 2024. Exhibit 3 (Austin Declaration) at ¶ 5.

8.       Immediately before and immediately after resigning, Smith took deliberate action to misappropriate Dairyland's confidential, proprietary, and trade secret information, including information related to the Company's operations, pricing models, and clients.

9.      More specifically, beginning the Friday before tendering his resignation, Smith began sending Dairyland's confidential, proprietary, and trade secret information to his personal email address. *Id.* at ¶¶ 10-12. Immediately after tendering his resignation, Smith downloaded and emailed to his personal email account certain confidential, proprietary, and trade secret information, namely (but not exclusively) Dairyland's customer lists and sales and pricing information associated with those customers. *Id.* at ¶¶ 11-13.

10.     Dairyland terminated Smith's employment on March 13, 2024, immediately after it learned that Smith had downloaded Dairyland's confidential, proprietary, and trade secret information and sent it to his personal email address. Ex. 1 at ¶ 9; Ex. 2 at ¶ 9.

11.     In addition to misappropriating Dairyland's confidential, proprietary, and trade secret information, Smith's actions were in breach of his Agreement with Dairyland.

12.     The information Smith misappropriated is invaluable to Dairyland and is the result of decades of goodwill and innovation in a highly competitive industry.

13.     Smith took this information for the sole purpose of using it to gain an unfair advantage in the market and to harm Dairyland.

14.     In further breach of his Agreement with Dairyland, Smith recently accepted employment a Sales Manager with Mr Greens, one of Dairyland's direct competitors in the wholesale food distribution industry.

15.     According to the Employment Agreement Mr Greens proposed to Smith, Smith is to serve as the "Sales Manager – Dallas" for Mr Greens. Ex. 3 at ¶ 19; *id.* at Ex. A.

16.     Upon information and belief, Mr Greens does not presently operate a Dallas office but has plans to do so in the near future. *See Contact Us*, MR GREENS PRODUCE, https://mrgreensproduce.com/contact-us/ (last accessed Apr. 29, 2024) (providing a business

address for a Dallas/Fort Worth location but, unlike all of Mr Greens's other listed locations, not providing a telephone number).

17.     In the meantime, according to his LinkedIn profile, Smith has responsibility for Mr Greens's sales in the Austin/San Antonio area. *See Tony Smith*, LINKEDIN, https://www.linkedin.com/in/tony-smith-04753882 (last accessed Apr. 29, 2024).

18.     Mr Greens is among Dairyland's strongest competitors in the Austin/San Antonio market. Ex. 1 at ¶ 10.

19.     Mr Greens is aware of the terms of the Agreement and continues to employ Smith in breach thereof.

20.     Thus, not only did Smith misappropriate Dairyland's confidential, proprietary, and trade secret information, but Defendants are now in a position to immediately use that information to harm Dairyland.

21.     Smith's misappropriation of Dairyland's confidential, proprietary, and trade secret information is potentially catastrophic to Dairyland's ability to compete in the market and has caused irreparable injury to Dairyland. Accordingly, Dairyland seeks a temporary restraining order, preliminary and permanent injunction, and actual and consequential damages, as may be determined over the course of this lawsuit.

## II.     PARTIES

22.     Dairyland is a Delaware Limited Liability Company engaged in interstate commerce.

23.     Defendant Anthony Smith is an individual and resident of Texas, who may be served at his residence located at 1431 Brewer Ln., Celina, Texas 75009 or wherever he may be found.

24.     Defendant Florida Veg Investments LLC dba Mr Greens Produce is a Florida Limited Liability Company doing business in Texas who may be served with process through its registered agent, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

### III.     JURISDICTION AND VENUE

25.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it involves a question of federal law under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.

26.     This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367 because all other claims are so related to the claim alleged under federal law that they form part of the same case or controversy.

27.     This Court has personal jurisdiction over Smith because he is a resident of Texas.

28.     This Court has personal jurisdiction over Mr Greens because it does business in Harris County, Texas, and the claims against it herein arise out of those contacts by Mr Greens. This Court also has personal jurisdiction over Mr Greens because it has purposely availed itself of the privilege of conducting activities with the State of Texas and had invoked the benefits and protection of Texas's laws. This Court also has personal jurisdiction over Mr Greens because it has committed a tort within the State of Texas and/or has committed a tort outside the State of Texas that has caused injury within the State.

29.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this district. Venue is also proper in the Southern District of Texas pursuant to the terms of the Agreement at issue in this litigation, under which the parties to this action agreed "to bring and pursue any suit, action or proceeding arising under or related to [the Agreement] only in

the state and federal courts in Harris County, Texas."

## IV.    FACTUAL ALLEGATIONS

### A.    Dairyland's Business

30.    Dairyland, one of the country's premier wholesale food distributers, distributes meat and produce to customers across the nation. It has a substantial and growing market in Texas, having recently acquired Hardie's and expanding further its business in the state.

31.    Dairyland's customer relationships and the pricing and methodologies it uses to serve its customers are of the utmost importance to its business model.

32.    Dairyland has cultivated its customer relationships and developed unique service offerings for those customers over decades. During this time, Dairyland has built a reputation and goodwill that is second-to-none in the rapidly growing and increasingly competitive wholesale food distribution industry.

### B.    Dairyland's Efforts to Safeguard It's Confidential, Proprietary, and Trade Secret Information

33.    Over the course of its nearly 40-year history, Dairyland has developed confidential, proprietary, and trade secret information to help it maintain its competitive advantage and goodwill, including, but not limited to, industry business know-how, employee lists, customer lists, supplier lists, referral source lists, the inherent skills, qualifications, and certification levels of past and present employees, computer software or data, business and operational methods, customer and location-specific requirements and specifications, costs, profits or margin information, pricing policies, operational methods, and plans for future development.

34.    Dairyland's confidential, proprietary, and trade secret information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

35.    Dairyland's confidential, proprietary, and trade secret information is critical to its

ability to maintain customer confidence, to respond to specific customer needs, and to continue building upon the goodwill of Dairyland's brand in the industry. Dairyland's confidential, proprietary, and trade secret information has independent economic value, actual and potential, to Dairyland because it is not generally known to other persons or businesses and could not be ascertained through proper means by people outside of Dairyland's employ. Ex. 3 at ¶ 18. Dairyland has expended considerable time, resources, and expertise to develop its confidential, proprietary, and trade secret information.

36.     Dairyland's confidential, proprietary, and trade secret information would be invaluable in the hands of its competitors, who could directly and immediately benefit from such information without having to expend the considerable time and resources required to independently develop such information through proper means. Accordingly, Dairyland takes reasonable measures to keep such information secret, including using confidentiality, non-competition, non-solicitation, and non-interference agreements, like the Agreement Smith signed, as well as intra-company restrictions on data access, such as maintaining its confidential, proprietary, and trade secret information in password-protected environments and only providing access to such categories of information to employees on a need-to-know basis. *Id.* at ¶ 17**.**

37.     Dairyland also maintains various policies in its Employee Handbook, applicable to Smith and all other Dairyland employees. Ex. 2 at ¶ 11. The Employee Handbook includes policies which provide, *inter alia*:

> a.  "Confidential Information" includes all non-public information about Dairyland's business, including but not limited to information regarding its finances; pricing; products and new product development; software and computer programs; marketing strategies; suppliers; customers and potential customers; knowledge,

skills, and abilities of personnel; and similar information belonging to Dairyland's clients (§ 5-16);

b.  Disclosure of Dairyland's Confidential Information, and violation of its Technology Use Policy or any other company policy, constitute employee misconduct and can subject the employee to immediate termination (§ 5-1);

c.  For employees who are not expected to regularly travel for work-related purposes or regularly be available after hours, access to their Dairyland-provided email and calendar on their personal mobile devices must be approved on a case-by-case basis by the employee's department head (§ 5-5);

d.  Employees with access to their Dairyland-provided email and calendar on their personal mobile devices are required to install Dairyland's device management software, accept that Dairyland's security policy will be enforced on the device, and protect Dairyland's confidential information and intellectual property, including trade secrets, through the use of their mobile devices (*Id.*);

e.  Dairyland's computer resources are to be used for legitimate and authorized business purposes only (§ 5-6);

f.  "Users are forbidden from using any email or messaging communication system (personal accounts, etc.) other than the official [Dairyland] system to conduct business communications and may not forward or store (in any form) business-related communications to personal accounts" (*Id.*); and

g.  "Users are strictly forbidden from transmitting any confidential [Dairyland] information, customer data, trade secrets or any other [Dairyland] proprietary materials to unauthorize[d] parties during employment and after termination" (*Id.*);

      h.   Confidential business information must be protected using security features (*e.g.*, secure print), and all printed confidential business information must be disposed of using confidential waste bins or shredders (*Id.*).

*See generally id.* at Ex. B.

38.    All Dairyland employees are required to complete periodic refresher training on Dairyland's policies, including its Code of Conduct, which Smith most recently completed on or about January 23, 2024. *Id.* at ¶¶ 12-13.

## C.    Smith's Restrictive Covenants with Dairyland

39.    Using its confidential, proprietary, and trade secret information, as well as its brand recognition and expertise, Dairyland has continued its expansion into the Texas market, most recently with its acquisition of Hardie's.

40.    On March 20, 2023, prior to and as a condition of his employment with Dairyland, Smith signed an Employee Confidentiality, Non-Solicitation, Non-Interference, and Non-Competition Agreement. *Id.* at ¶¶ 6, 10; *id.* at Ex. A.

41.    Pursuant to the terms of the Agreement, Dairyland promised to provide, and did provide, Smith access to sensitive confidential, proprietary, and trade secret information related to Dairyland's business and strategic market plans and position, including, but not limited to: customer lists, contact information, service locations, pricing, and service performance methods and know-how particular to each of Dairyland's customers. *See generally id.* at Ex. A.

42.    By the Agreement, Dairyland further promised to provide Smith with specialized training and allowed him access to and use of Dairyland's customer relationships to further develop Dairyland's goodwill. *Id.* at p. 1

43.    Regarding Dairyland's confidential, proprietary, and trade secret information, the Agreement states in relevant part as follows:

1.2     Employee agrees and acknowledges that it is and will continue to be a condition of Employee's employment with the Company that Employee never use or disclose in the course of Employee's employment with the Company any trade secret or confidential or proprietary information of any person or entity by which Employee has been employed or for which Employee has provided any services.

## 3.     Confidential Information.

3.1     Employee acknowledges and agrees that Employee's duties will expose Employee to, and because of Employee's promises to the Company under this Agreement, the Company agrees to provide Employee with, confidential and proprietary data and information concerning the business of the Company and its parents and affiliates, referred to herein as "Confidential Information." Confidential Information includes but is not limited to: any and all information or material propriety to the Company or its affiliates, or any other information provided by or relating to the Company that Employee obtains knowledge of or access to, whether orally or in writing, as a result of the Company's direct discussions with Employee or Employee's employment with the Company, regardless of any and all analyses, compilations, studies or other documents, records or materials prepared by the Company that contain or otherwise reflect or are based, in whole or in part, on the Company's Confidential Information, and includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing):  trade secrets as that term is defined and interpreted under the Uniform Trade Secrets Act ("UTSA") and the Defend Trade Secrets Act ("DTSA") and any state equivalent, customer/prospective customer information, customer/client lists and all lists or other compilations containing client, customer or vendor information, costs, profits, markets, sales, products, pricing policies, price lists, operational methods, technical processes, inventions, algorithms, ideas, methods, models, work flows, specifications, formulas, software, source code, object code, data, programs, patent and trademark applications, other works of authorship, contracts and arrangements, business records, financial information and projections, compensation arrangements, personnel files, tax arrangements and strategies, intercompany arrangements, know-how, improvements, discoveries, research and development, designs and techniques, existing or proposed acquisitions, strategic alliances, or joint ventures, and information not readily available to the public.  "Confidential Information" shall not be required to be marked as "confidential," "proprietary," "secret," or any other similar designation. Specifically, Confidential Information includes, but is not limited to, any and all  information of a confidential, proprietary, or secret nature which is related in any way to: (a) the present or future business of the Company and its clients, (b) the research and development efforts of the Company and its clients, (c) the registration of patents, trademarks, or inventions of the Company and its clients, or (d) the business of any customer or supplier of the Company.

3.2     Employee acknowledges and agrees that each and every part of the Confidential Information (a) has been developed by the Company at significant effort and expense is sufficiently secret to derive economic value from not being generally known to other parties; (b) is proprietary to and a trade secret of the Company and, as such, is a valuable, special and unique asset of the Company; and (c) constitutes a protectable business interest of the Company. Employee also acknowledges and agrees that any unauthorized use or disclosure of any Confidential Information by Employee will cause irreparable harm and loss to the Company.

3.4    Throughout Employee's employment with the Company and at all times thereafter (a) Employee shall hold all Confidential Information in the strictest confidence and take all reasonable precautions to prevent its inadvertent disclosure to any unauthorized person; (b) Employee shall not, directly or indirectly, use, disclose, divulge, communicate, or make available to any other person or entity, any of the Confidential Information, other than (i) as specifically required by law, regulation or legal process; or (ii) in the proper performance of Employee's duties during Employee's employment with the Company; (c) Employee will not use any Confidential Information to attempt to solicit, induce, recruit, or take away any of the Company's clients, customers or employees, or to interfere with or attempt to interfere with Company's relationship with any of its vendors or suppliers; and (d) if Employee learns that any person or entity is taking or threatening to take any actions which would compromise any Confidential Information, Employee will promptly advise the Company of all facts concerning such action or threatened action.  Employee understands that the obligations under this Section 3.4 shall terminate only at such time (if any) as the Confidential Information in question becomes generally known to the public other than through a breach of Employee's obligations under this Agreement or any other action or failure to act by Employee or anyone acting in concert with or on behalf of Employee.  If Employee is requested pursuant to, or required by, any law, regulation or legal process to disclose, divulge or communicate any Confidential Information, Employee shall provide the Company with written notice of such request or requirement as soon as possible, and shall comply with the Company's efforts to obtain any court order or other appropriate relief to prevent or limit any such disclosure.  Nothing in this Agreement prohibits Employee from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress or any agency inspector General or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

*Id.* at pp. 1-3.

44.    The Agreement also contains restrictive covenants to prevent Smith from using Dairyland's confidential, proprietary, and trade secret information to compete with Dairyland (or for the benefit of a competitor of Dairyland) and gain an unfair advantage to Dairyland's detriment in the market. More specifically, the Agreement states as follows:

4.4     During Employee's employment and for a period of six (6) months from Employee's last date of employment (regardless of the reason for Employee's termination and whether such termination is voluntary or involuntary), Employee shall not (a) be employed in a supervisory, managerial or employee capacity by, or (b) directly or indirectly provide (whether as employee, consultant, independent contractor, owner, officer, partner, principal, joint venturer, shareholder, director, member, manager, investor, agent, or otherwise) any services similar to those Employee provided to the Company during Employee's employment with the Company to any business, enterprise, person, or entity that engages in or is actively planning to engage in any business that is directly and materially competitive with the business conducted by the Company during Employee's employment with the Company and that operates within, or within 50 miles of, any county in which Employee worked or for which Employee was responsible during Employee's employment by the Company, including but not limited to Performance Food Group, Inc., Sysco Corporation, Gordon Food Service, Inc., Meats by Linz, Inc., Lone Star Meats, Ltd., US Foods Holding Corp., Ben E. Keith Company, Martin Preferred Foods, L.P., Hana Gourmet, Inc. dba Beyond Gourmet, Hardie's F&V, LLC, Brother's Produce, Incorporated, Chefs' Produce of Dallas, Inc., Chefs' Produce of Houston, Inc., Russell McCall's, Inc., dba Gourmet Foods International, D'Artagnan, Inc., Euro-Mid, Inc., Labatt Food Service LLC, Lisanti Foodservice of Texas Inc., Dawn Foods International, Inc., Shamrock Foods Company, and Regalis Texas, LLC (collectively with their current and future affiliates, "Named Competitors").

*Id.* at p. 4.

45.     The Agreement provides further that Dairyland and Smith would "bring and pursue any suit, action or proceeding arising under or related to [the Agreement] only in the state and federal courts in Harris County, Texas." *Id.* at p. 7.

**D.     Smith's Sudden Resignation from Dairyland and Misappropriation of Confidential, Proprietary, and Trade Secret Information**

46.     On Monday, March 11, 2024, Smith, without any prior notice, informed Dairyland that he intended to resign effective March 25, 2024. Ex. 3 at ¶ 5.

47.     Shortly before tendering his resignation, Smith began sending Dairyland's confidential, proprietary, and trade secret information to his personal email address.

48.     For example, on Friday, March 8, 2024, Smith emailed copies of Dairyland's year-to-date "Usage Reports" for the Dallas/Fort Worth and Austin/San Antonio regions to his personal email address. *Id.* at ¶ 10. On March 11, 2024, Smith emailed the Usage Report for the Houston region to his personal email address. *Id.* at ¶ 11. All three Usage Reports contain a *complete* customer listing and sales volume for the respective markets over the entirety of 2024 to that point.

*Id.* at ¶ 12.

49.     After notifying Dairyland of his resignation, Smith continued to take actions to harm Dairyland by taking into his personal possession Dairyland's confidential, proprietary, and trade secret information, including, but not limited to, customer contact information, pricing agreements, and other marketing and sales information unique to each of Dairyland's customers in the Texas market.

50.     For example, on March 12, 2024, **the day after he tendered his resignation**, Smith downloaded Dairyland's "Week-Over-Week Margin Analysis" report, which  contains, among other highly confidential information, a complete customer listing and its sales volume, sales forecast, pricing, and profit margin details—all broken down by geographic region, customer, and product—across the entire State of Texas for all of 2024. *Id.* at ¶ 13.

51.     There was no legitimate purpose for Smith downloading this information, as it was available to him at all times from any remote location through his Dairyland-provided access to its systems. *Id.* at ¶ 14. There was also no legitimate purpose for Smith to even access information regarding sales or customers in Dairyland's Houston or Austin/San Antonio regions—areas for which he no longer bore responsibility as a Sales Manager—as and when he did. *Id.* at ¶ 15. Smith at no time had Dairyland's consent to take such information into his personal possession, custody, or control for any purpose whatsoever. *Id.* at ¶ 16.

52.     Dairyland terminated Smith's employment on March 13, 2024, immediately after it learned that Smith had downloaded Dairyland's confidential, proprietary, and trade secret information and emailed it to his personal email address. Ex. 1 at ¶ 9; Ex. 2 at ¶ 9.

53.     Smith, in breach of his Agreement with Dairyland, recently accepted employment with one of Dairyland's direct competitors, Mr Greens. Specifically, according to his Employment

Agreement with Mr Greens, Smith is to serve as its Sales Manager in Dallas—*i.e.*, the same position and area of responsibility he had with Dairyland at the time, and one of the regions about whom Smith stole Dairyland's confidential, proprietary, and trade secret information. Ex. 1 at ¶ 7; Ex. 2 at ¶ 7; Ex. 3 at ¶¶ 10, 19; Ex. 3 at Ex. A.

54.     On information and belief, Mr Greens does not presently operate a Dallas office but has plans to do so in the near future. *See Contact Us*, MR GREENS PRODUCE, https://mrgreensproduce.com/contact-us/ (last accessed Apr. 29, 2024).

55.     In the meantime, Smith is responsible for Mr Greens's sales in the Austin/San Antonio region—*i.e.* an area Smith previously oversaw for Dairyland and another of the regions about which Smith stole Dairyland's confidential, proprietary, and trade secret information (which information Smith had no legitimate Dairyland-related purpose to even *access*, much less download and email himself, given he no longer bore responsibility for that area at the time). *Tony Smith*, LINKEDIN, https://www.linkedin.com/in/tony-smith-04753882 (last accessed Apr. 29, 2024); Ex. 3 at ¶¶ 10, 15.

56.     Mr Greens is also among Dairyland's strongest competitors in the Austin/San Antonio market. Ex. 1 at ¶ 10.

57.     Thus, not only did Smith misappropriate Dairyland's confidential, proprietary, and trade secret information, but Defendants are now in a position to use that information to harm Dairyland.

**E.     Dairyland Has Demanded Compliance with Smith's Agreement.**

58.     On March 20, 2024, Dairyland sent Smith, via email and overnight delivery to his home address, a letter reminding him of his ongoing confidentiality obligations to Dairyland and demanded that he immediately cease and desist from *inter alia* accessing, using, or disclosing Dairyland's confidential, proprietary, and trade secret information, and further demanded he

provide Dairyland with his written assurance that he would comply with such obligations.

59.     Also on March 20, 2024, Dairyland sent a similar letter to Mr Greens via email and overnight delivery to the Chairman of Mr Greens's Board of Directors.

60.     By letter dated March 27, 2024, Smith and Mr Greens responded through their joint attorney to those letters.

61.     On March 29, 2024, Dairyland responded by letter to Defendants' counsel, explaining Smith's breaches of the Agreement, Mr Greens's tortious interference with the Agreement, and demanding Defendants' strict compliance with the terms thereof.

62.     To date, Defendants have failed to cure such wrongful conduct.

## V.     CAUSES OF ACTION

**A.      Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1826, *et seq*. (as against Smith)**

63.     Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

64.     Smith is liable to Dairyland for violations of the Defend Trade Secrets Act ("**DTSA**").

65.     As set forth more fully above, Dairyland's trade secrets include, without limitation, confidential, proprietary, and trade secret information related to Dairyland's business and strategic market plans and position, customer lists, contact information, service locations, pricing, and service performance methods and know-how particular to each of Dairyland's customers.

66.     Dairyland's confidential, proprietary, and trade secret information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

67.     Dairyland's confidential, proprietary, and trade secret information has independent economic value, actual and potential, to Dairyland because it is not generally known to other persons or businesses and cannot be ascertained through proper means by people outside of

Dairyland's employ. Dairyland has expended considerable time, resources, and expertise to develop its confidential, proprietary, and trade secret information.

68.     Dairyland took reasonable precautions to prevent disclosure of its confidential, proprietary, and trade secret information through various means, including using confidentiality, non-competition, non-solicitation, and non-interference agreements, as well as intra-company restrictions on data access. Additionally, Dairyland terminated Smith's employment on March 13, 2024, immediately after it learned that Smith had downloaded Dairyland's confidential, proprietary, and trade secret information and emailed it to his personal email address.

69.     Smith misappropriated Dairyland's confidential, proprietary, and trade secret information by taking such information into his personal possession, custody, or control without Dairyland's consent. At the time of Smith's taking, he knew (or, at a minimum, had reason to know) that he acquired such information under circumstances giving rise to a duty that he maintain the secrecy thereof and limit his use of such information to legitimate, Dairyland-related business purposes.

70.     As a direct and proximate result of Smith's intentional and wrongful conduct, Dairyland has suffered, is suffering, and will continue to suffer financial losses, imminent and permanent irreparable harm, loss of the confidentiality of their trade secrets, loss of goodwill, loss of business opportunities, and other continuing harm. Smith's conduct foreseeably caused these harms and other harms as alleged above.

71.     Further, as a direct and proximate result of Smith's intentional and wrongful acts and omissions, Dairyland has suffered, is suffering, and will continue to suffer immediate and irreparable harm and loss.

72.     Dairyland thus has no adequate remedy at law to redress Smith's past and ongoing

violations of the DTSA, and Smith's conduct, unless immediately addressed, will continue to cause Dairyland irreparable harm and damage in an amount that cannot be presently fully quantified, posing serious risk to Dairyland's business.

73.     Smith has acted willfully, maliciously, and with reckless disregard to the rights of Dairyland, justifying an award of punitive damages.

74.     Dairyland therefore requests that the Court immediately enjoin Smith from further use or disclosure of Dairyland's confidential, proprietary, and trade secret information, and instruct Smith to immediately retract all prior unauthorized disclosure and use of Dairyland's confidential, proprietary, and trade secret information from any third-parties.

75.     Dairyland further requests the Court order Smith to pay a reasonable royalty for any use or disclosure of Dairyland's confidential, proprietary, and trade secret information to any third-parties to the extent such use or disclosure cannot be effectively withdrawn or retracted.

76.     Additionally or alternatively, Dairyland requests an award for damages of actual loss caused by Smith's misappropriation of Dairyland's confidential, proprietary, and trade secret information, an award for damages for the unjust enrichment caused by the misappropriation of Dairyland's confidential, proprietary, and trade secret information, which is not otherwise addressed in computing damages for actual loss, or an award for a reasonable royalty for Smith's unauthorized uses and/or disclosure of Dairyland's confidential, proprietary, and trade secret information.

**B.     Breach of Contract (as against Smith)**

77.     Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

78.     As set forth more fully above, Smith and Dairyland entered into the Agreement on March 20, 2023.

79.     By the terms of the Agreement, Dairyland promised to, and did, provide Smith: access to its confidential, proprietary, and trade secret information; specialized training related to Dairyland's business; and access to and use of its customer relationships for the purpose of generating additional goodwill on behalf of Dairyland.

80.     In exchange for such consideration, the Agreement requires Smith to hold in strictest confidence and to not misuse or disclose Dairyland's confidential, proprietary, and trade secret information.

81.     To further protect the good and valuable consideration Dairyland provided to Smith, he further agreed per the terms of the Agreement that "[d]uring [his] employment and for a period of six (6) months from [his] last date of employment regardless of the reason for [his] termination and whether such termination is voluntary or involuntary)," he would not work for an entity "that engages in or is actively planning to engage in any business that is directly and materially competitive with the business conducted by the company during [his] employment with [Dairyland] and that operates within, or within 50 miles of, any county in which [Smith] worked or for which [he] was responsible during [his] employment by [Dairyland.]"

82.     Smith breached the Agreement by misappropriating, disclosing, and misusing Dairyland's confidential, proprietary, and trade secret information.

83.     In further violation of his Agreement with Dairyland, Smith became employed and is currently employed by Mr Greens—a direct competitor of Dairyland in the food distribution business—within 50 miles of the counties in which Smith worked and for which he was responsible while employed by Dairyland.

84.     Thus, Smith also breached his Agreement with Dairyland by becoming employed with Mr Greens within six months after his termination from Dairyland.

85.     Smith's breaches of the Agreement proximately caused irreparable injury to Dairyland, as well as actual, consequential, and incidental damages in an amount to be determined at trial.

86.     Dairyland's remedies at law are insufficient, standing alone, to compensate for Smith's wrongful conduct. Dairyland is entitled to, and hereby requests, specific performance by Smith of his contractual obligations.

87.     In addition to specific performance, Dairyland is also entitled to attorneys' fees and expenses under Section 38.001 of the Texas Civil Practices and Remedies Code, as Dairyland retained counsel to enforce Smith's contractual obligations under the Agreement. Pursuant to Texas Civil Practice and Remedies Code § 38.002, Dairyland has presented Smith with its claim under the contract through his attorney and Smith has refused to comply. Dairyland is therefore entitled to recover its reasonable attorneys' fees, costs, and expenses for the prosecution of its claims, any appeals, and post-judgment collection services.

**C.     Tortious Interference with Existing Contractual Relations (as against Mr Greens)**

88.     Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

89.     As set forth more fully above, Smith entered into the Agreement with Dairyland.

90.     The Agreement is a valid and enforceable contract, subject to interference.

91.     The Agreement in relevant part prohibits Smith, during and for a period of six (6) months from his last date of employment with Dairyland, from (i) being employed and/or directly or indirectly providing services as an employee to provide services similar to those he provided to Dairyland (ii) to any business that directly competes with Dairyland (iii) within, or within 50 miles of, any county in which Smith worked for Dairyland or for which he was responsible at any time during his employment with Dairyland. Agreement § 4.4.

92.     During Smith's employment with Dairyland, he provided sales services in connection with Dairyland's wholesale food distribution business and was responsible for sales throughout the State of Texas.

93.     Mr Greens recently hired Smith as a Sales Manager in connection with Mr Greens's wholesale food distribution business in the Dallas, Austin, and San Antonio regions.

94.     Mr Greens employed and continues to employ Smith in that capacity with the knowledge such employment constitutes a breach of the terms of his Agreement.

95.     By employing and continuing to employ Smith in breach of the terms of his Agreement, Mr Greens has engaged in willful and intentional acts of interference with the Agreement.

96.     Mr Greens's wrongful acts have proximately caused and continue to cause irreparable injury to Dairyland, as well as actual damages in an amount to be determined at trial.

97.     In addition to actual damages, Dairyland is entitled to, and hereby requests, an award of exemplary damages plus interest at the maximum allowable rate under applicable law, and court costs.

98.     Pursuant to Texas Civil Practice and Remedies Code § 38.002, Dairyland has presented Mr Greens, through the parties' respective counsel, with Dairyland's contractual claim, and Mr Greens has refused to correct its wrongful actions. Dairyland is therefore entitled to recover its reasonable attorneys' fees, costs, and expenses for the prosecution of its claims, any appeals, and post-judgment collection services.

**D.     Breach of Fiduciary Duty (as against Smith)**

99.     Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

100.     Dairyland employed Smith in a senior leadership role as Director of Sales for Texas

and then Sales Manager, vesting in Smith the utmost trust and confidence in running and managing various aspects of Dairyland's business, including the day-to-day interactions with Dairyland's customers. Thus, a common law fiduciary relationship arose, charging Smith with duties of loyalty and care to Dairyland.

101.     As set forth above, Smith misappropriated Dairyland's confidential, proprietary, and trade secret information. Smith's conduct was intentional, malicious, and with wanton disregard for the rights and interests of Dairyland.

102.     Smith's conduct constitutes a breach of at least the following fiduciary duties: duty of loyalty and good faith, duty of candor, duty to refrain from self-dealing, duty to act with integrity, duty of fair and honest dealing, and duty of full disclosure.

103.     As a result of Smith's breach of his fiduciary duties, Dairyland has suffered damages in an amount to be determined at trial, but which exceed $75,000. Further, Smith's various breaches of his fiduciary duties proximately caused irreparable injury to Dairyland, as well as actual, consequential, incidental, and punitive damages, in an amount that is not readily quantifiable and cannot be fully remedied or repaired through an award of damages.

**E.     Harmful Access by Computer Act, TEX. CIV. PRAC. & REM. CODE § 143, *et seq.* (as against Smith)**

104.     Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

105.     As set forth more fully above, Smith knowingly and intentionally accessed a computer, computer network, and/or computer system to access and misappropriate Dairyland's confidential information and/or trade secrets, including, without limitation, information related to Dairyland's business and strategic market plans and position, financial information and forecasts, customer lists, contact information, service locations, pricing, and service performance methods

and know-how particular to each of Dairyland's customers.

106.    Smith's access of such information with the purpose to take it into his personal possession and to use the information to the detriment of Dairyland exceeded the scope of the consent he was granted. Such access by Smith was therefore undertaken without Dairyland's effective consent.

107.    Smith acted with the intent to obtain or use a file, data, or proprietary information stored in the computer, network, or system to defraud or harm Dairyland.

108.    Smith's access violated a clear and conspicuous prohibition by Dairyland regarding its computers, computer network, and computer system.

109.    Smith accessed a computer, computer network, or computer system in violation of his express contractual agreement to not to improperly access, use, or disclose Dairyland's confidential, proprietary, and trade secret information.

110.    Smith's unlawful conduct proximately caused irreparable injury to Dairyland, as well as actual, consequential, incidental, and punitive damages, in an amount that is not readily quantifiable and cannot be fully remedied or repaired through an award of damages.

111.    Dairyland has brought its claim against Smith under Tex. Civ. Prac. & Rem. Code Ch. 143 within the statutory period proscribed thereby.

**F.    Texas Theft Liability Act, TEX. CIV. PRAC. & REM. CODE Ch. 134 (as against Smith)**

112.    Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

113.    Dairyland's confidential, propriety, and trade secret information is rightly Dairyland's property, as that term is defined by Tex. Pen. Code § 31.01.

114.    Smith appropriated such property without Dairyland's effective consent.

115.    Smith unlawfully appropriated such property with the intent to deprive Dairyland, in violation of Tex. Penal Code § 31.03.

116.    Smith's actions were undertaken with malicious intent.

117.    Smith's violation of the Texas Theft Liability Act proximately caused actual damages to Dairyland in an amount to be determined by the trier of fact.

118.    In connection with such violation, Smith seeks all actual damages found by the trier of fact, punitive damages to the maximum extent permissible by law, pre- and post-judgment interest at the maximum allowable rate under applicable law, and all costs of court.

**G.    Common Law Civil Conversion (as against Smith)**

119.    Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

120.    As set forth more fully above, Dairyland owned, had legal  possession of, and/or was entitled to possession of its confidential, proprietary, and/or trade secret information which includes, without limitation, information related to Dairyland's business and strategic market plans and position, customer lists, contact information, service locations, pricing, and service performance methods and know-how particular to each of Dairyland's customers. Such information had, as of the time of Smith's conversion thereof, been merged into documentary form.

121.    By downloading and emailing himself Dairyland's confidential, proprietary, and/or trade secret information, Smith assumed and exercised dominion and control over such information in a manner which was unlawful and not authorized by Dairyland.

122.    Smith's dominion and control over Dairyland's confidential, proprietary, and/or trade secret information was to the exclusion of and inconsistent with Dairyland's exclusive rights to and in such information.

123.    Smith's actions were undertaken with malicious intent.

124.    Dairyland made a pre-suit demand to Smith for the return of its confidential, proprietary, and/or trade secret information.

125.    Prior to the institution of this suit, Smith has failed to return Dairyland's confidential, proprietary, and/or trade secret information.

126.    Smith's unlawful conduct proximately caused, and Dairyland hereby seeks recovery of, actual damages in an amount to be determined by the trier of fact, punitive damages to the maximum extent permissible by law, pre- and post-judgment interest at the maximum allowable rate under applicable law, and all costs of court.

## VI.    APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTION

127.    Dairyland incorporates by reference and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

128.    Dairyland's Request for Temporary Restraining Order and Preliminary and Permanent Injunction is authorized by both Federal Rule of Civil Procedure 65 and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.

129.    Dairyland pleads for permanent relief and will likely prevail against and recover from Defendants after a trial on the merits, with respect to one or more, if not all, of the causes of action Dairyland asserts in this Verified Complaint. In the meantime, and as a result of Defendant's conduct, Dairyland has suffered, and will continue to suffer, substantial, immediate, and irreparable damage and harm, including harm that is not readily quantifiable and cannot be fully remedied or repaired through an award of damages, if Dairyland's Request for a Temporary Restraining Order and Preliminary Injunction is denied. Dairyland has no other adequate legal remedy.

130.    Injury to Dairyland is irreparable. Defendants' actions as described herein have

disrupted, or will disrupt, Dairyland's business, constituting irreparable harm. *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ.). Further, if the injunction is not issued, the harm that will occur is irreparable because Dairyland's damages are not presently ascertainable or easily calculated, if they can be ascertained or calculated at all. *Wright v. Sort Sup.*, 137 S.W.3d 289, 294 (Tex. App.—Beaumont 2004, no pet.). Dairyland has no adequate remedy at law for the harm that has been and will continue to be caused by the conduct and actions of Defendants, as described herein. FED. R. CIV. P. 65; *Texas Indus. Gas. v. Phoenix Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist] 1992, no writ). Moreover, such immeasurable and irreparable harm will continue unless and until Defendants are temporarily restrained and enjoined, and thereafter permanently enjoined.

131.    Specifically, Dairyland requests the Court issue an immediate temporary restraining order, set a hearing for a preliminary injunction, and, after a properly noticed hearing, issue a preliminary injunction, and ultimately a permanent injunction, that:

a.    Orders and directs Smith to immediately cease and desist from (i) being employed and/or directly or indirectly providing services as an employee to provide services similar to those he provided to Dairyland (ii) to any business that directly competes with Dairyland (iii) within the State of Texas (iv) through September 13, 2024;

b.    Orders and directs Defendants, and all others affiliated or acting in concert with either or both of them, to immediately cease and desist from using or disclosing any of Dairyland's trade secrets and/or confidential or proprietary information including, without limitation:

- Customer lists, contact information, service locations, and pricing specifications and methodologies for Dairyland's customers;

- Service performance methods, techniques, and know-how used to service Dairyland's customers;

- Information concerning current and former Dairyland personnel, including their identities, roles, skills, qualifications, certifications levels, capabilities, and competitive compensation; and

- Dairyland's financial data or data of any sort developed or compiled by Dairyland and its affiliates;

c.    Orders and directs Smith, and all others affiliated or acting in concert with him, to immediately cease and desist from  engaging in, or attempting to engage in, selling, promoting, or providing products or services in competition with Dairyland to  any person or entity who was, between March 13, 2023 and March 13, 2024, a customer, client, or referral source of Dairyland (i) with whom Smith had any responsibility during his last 12 months of employment with Dairyland, and/or (ii) who Smith was involved in soliciting or attempting to solicit on behalf of Dairyland during his last 12 months of employment with Dairyland;

d.    Orders and directs Smith, and all others affiliated or acting in concert with him, to immediately cease and desist from  soliciting for employment or retention, knowingly assisting in the employment or retention of, or seeking to influence or induce to leave Dairyland's employment or service any individual employed by Dairyland between March 13, 2023 and March 13, 2024;

e.    Orders and directs Defendants, and all others affiliated or acting in concert with either or both of them, to immediately return all of Dairyland's records, documents, and files, electronically stored or otherwise, in Smith's custody, possession, and/or control, including but not limited to the trade secrets and confidential and proprietary information described in this Complaint, and any electronic devices on which such information is stored, including but not limited to computers, laptops, hard drives, thumb drives, or mobile phone devices; and

f.    Prohibits Defendants, and all others affiliated or acting in concert with either or both of them, from intentionally deleting, destroying, or discarding any files or other documents that belong to Dairyland or that contain, reference, or incorporate confidential or proprietary information that belongs to Dairyland.

132.    Dairyland further requests that Defendants be cited to appear and show cause why a preliminary injunction should not be issued enjoining them during the pendency of this action from the activities and conduct described in this Complaint.

## VII.    PRAYER FOR RELIEF

Based on the forgoing, Dairyland prays that the Court issue a citation to Defendants to appear and answer and that Dairyland be awarded judgment against Defendants, to include the following:

a.      Temporary restraining order;

b.      Preliminary injunction;

c.      Permanent injunction;

d.      Actual, consequential, and incidental damages;

e.      Exemplary damages as allowed by law;

f.      Court costs;

g.      Reasonable and necessary attorneys' fees as allowed by law and equity;

h.      Pre-judgment and post-judgment interest at the maximum allowable rate permitted by applicable law; and

i.      All other and further relief to which Dairyland is legally and/or equitably entitled.

Dated: April 30, 2024.

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

By: */s/ Julia Trankiem*

    **Julia Y. Trankiem** (Attorney-in-Charge)
    Texas Bar No. 24118672
    *jtrankiem@huntonak.com*
    600 Travis St., Suite 4200
    Houston, Texas 77002
    Telephone: (713) 220-4200
    Facsimile: (713) 220-4285

    **Amber M. Rogers**
    Texas Bar No. 24056224
    *arogers@huntonak.com*
    **Theanna Bezney**
    Texas Bar No. 24089243
    *tbezney@huntonak.com*
    1445 Ross Avenue, Suite 3700
    Dallas, Texas 75202
    Telephone: (214) 979-3000
    Facsimile: (214) 880-0011

    **COUNSEL FOR PLAINTIFF**
    **DAIRYLAND PRODUCE LLC**