IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **DAIRYLAND PRODUCE LLC,** § | |
| § | |
| *Plaintiff,* § | |
| § | |
| vs. § | **CIVIL ACTION NO.** _____ |
| § | |
| **ANTHONY SMITH and** § | |
| **FLORIDA VEG INVESTMENTS LLC** § | |
| **dba MR GREENS PRODUCE,** § | |
| § | |
| *Defendants.* § | |

## DECLARATION OF MARK AUSTIN

1. My name is Mark Austin. I am over the age of 21 and competent to make this Declaration. My business address is 1005 North Cockrell Hill Road, Dallas, TX 75211. The facts set forth herein are within my personal knowledge and are true and correct.

2. I am a Senior Vice President for The Chefs' Warehouse, Inc. ("**CW**"). Dairyland Produce LLC ("**Dairyland**") is a wholly-owned subsidiary of CW.

3. Defendant Anthony Smith ("**Smith**") was employed by Dairyland as a Director of Sales and, later, as a Sales Manager.

4. In connection with his job duties and responsibilities, Smith had access to Dairyland's confidential and proprietary business information, including but not limited to its customers' identities, purchase histories, preferences, pricing, and profit margins.

5. On Monday, March 11, 2024, Smith, without any prior notice, informed Dairyland that he was resigning effective March 25, 2024.

6. As a normal course of action when I receive a notice of resignation from an employee with the level of access and confidential knowledge that Smith had, I asked Dairyland's Director of Information Technology Chris Lambert ("**Lambert**") to review Smith's company-provided email account and document downloads for any recent suspicious activity.

7. Lambert advised me that he found evidence that Smith had downloaded several reports from our enterprise resource planning ("**ERP**") system, and that Smith had sent several messages with attachments from his work email to his personal email account, in the days immediately before, on, and after Smith gave his notice of resignation.

8. Lambert provided me full access to Smith's Dairyland-provided email account, and I undertook a secondary review thereof on or about March 12, 2024.

9. During my review, I identified multiple messages demonstrating that over the preceding few days, Smith sent Dairyland's confidential, proprietary, and trade secret information to his personal email address.

10. By way of example and not limitation, on March 8, 2024—*i.e.* the Friday before tendering his resignation—Smith emailed copies of Dairyland's "Usage Reports" for the Dallas and Austin/San Antonio regions to his personal email address.

11. On March 11, 2024, Smith emailed the Usage Report for the Houston region to his personal email address.

12. All three Usage Reports contain a complete customer listing and sales volume for their respective markets over the entirety of 2024 to that point.

13. On March 12, 2024, the day after he tendered his resignation, Smith downloaded Dairyland's "Week-Over-Week Margin Analysis" report, which contains, among other highly confidential information, a complete customer listing and sales volume, sales history, pricing, and profit margin details—all broken down by geographic region, customer, and product—across the entire State of Texas for all of 2024.

14. There was no legitimate purpose for Smith to download any of this information, as it was available to him at all times from any remote location through his Dairyland-provided access to its online document storage system and ERP system.

15. There was no legitimate purpose for Smith to access information regarding sales or customers in Dairyland's Houston or Austin/San Antonio regions—areas for which he no longer bore responsibility as a Sales Manager—as and when he did.

16. Smith at no time had Dairyland's consent to take its confidential, proprietary, and trade secret information into his personal possession, custody, or control for any purpose whatsoever.

17. Dairyland takes reasonable measures to keep secret the information downloaded and taken by Smith, including by (i) requiring employees to execute confidentiality, non-solicitation, non-interference, and non-competition agreements; (ii) where such information exists in electronic format, storing such information in password-protected environments; and (iii) limiting access to such information to those employees with a need to know such information in connection with their work for Dairyland.

18. The information downloaded and taken by Smith derives actual and/or potential independent economic value from not being generally known to, and not being readily ascertainable through proper means by, third parties who can obtain economic value from the disclosure or use of such information.

19. My review of Smith's email account also revealed an email sent from his personal email adress to his Dairyland-provided account on February 22, 2024. Attached to that email was the document attached hereto as <u>Exhibit A</u>.

20. I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 26th day of April, 2024.

_____
Mark Austin

# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") dated as of March 15, 2024 (the "Effective Date"), is entered by and among FLORIDA VEG INVESTMENTS LLC, a Florida limited liability company (the "Company"), DEMETER HOLDCO, LLC, a Delaware limited liability ("Holdco"), and Tony Smith (the "Executive").

Section 1.   Employment.  The Company shall employ the Executive, and the Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date and ending as provided in Section 4 (subject to renewal as described in Section 4(a), the "Employment Period").

Section 2.   Position and Duties.

(a)   During the Employment Period, the Executive shall serve as the Sales Manager – Dallas of the Company and shall have the usual and customary duties, responsibilities and authority of such position, subject to the power of the board of managers (or similar governing body) of Holdco (the "Board") or the Chief Executive Officer of the Company (i) to reasonably expand or limit such duties, responsibilities and authority, and (ii) to override the actions of the Executive to the extent permissible by law.  Additionally, during the Employment Period, the Executive shall, if so requested by the Company, also serve, without additional compensation, as an officer or board member of Holdco and/or entities from time to time directly or indirectly owned or controlled by Holdco, the Company and/or the direct and indirect subsidiaries thereof (each of the latter hereinafter referred to as an "Affiliate", and Holdco and its Affiliates, including the Company, collectively hereinafter referred to as the "Demeter Companies").

(b)   The Executive shall report to the Company's Vice President of Sales – Texas or his designee and shall devote the Executive's reasonable best efforts and all of the Executive's active business time and attention to the business and affairs of the Demeter Companies.  The Executive shall perform the Executive's duties and responsibilities in a diligent and professional manner.  During the Employment Period, the Executive shall not engage in any outside business activity without the prior written approval of the Board; provided, however, that the Executive may engage in community, charitable and social activities and make passive investments, in each case, not interfering with the Executive's performance and obligations hereunder.

Section 3.   Compensation.  During the Employment Period, the Executive shall be entitled to the following:

(a)   *Base Salary*.  The Company will pay the Executive a base salary at the annualized rate of $130,000 in accordance with the Company's regular payroll practices (as in effect from time to time, the "Base Salary").  The Base Salary will be reviewed at least annually by the Board for a potential increase, if requested by the Executive.

(b)   *Annual Bonus*.  With respect to each fiscal year ending during the Employment Period, the Executive will be eligible to earn an annual bonus with a target annual bonus opportunity equal to 33.33% of the Base Salary that was paid to the Executive in such year, based upon the achievement of such performance targets as may be established by the Board in its

discretion following consultation with the Company's Chief Executive Officer (each, an "Annual Bonus"). Payment of an Annual Bonus shall be contingent upon the Executive's continued employment with the Company through the applicable payment date. Each Annual Bonus, if earned, shall be paid in a lump sum promptly following the finalization of the Company's audited financial statements for the applicable year.

(c) *Benefits*. The Executive shall be eligible to participate in all employee benefit programs as in effect from time to time for which employees of the Company are generally eligible in accordance with the normal terms of such programs, including not less than four (4) weeks of vacation per year.

(d) *Business Expenses*. The Company shall reimburse the Executive for all reasonable and documented business expenses (including reasonable travel expenses, out-of-pocket expenses and cell phone and cell phone related charges) incurred by the Executive in performing services hereunder in accordance with Company policy, as in effect from time to time.

(e) *Profits Interests Award*. On or as soon as practicable after the Effective Date, Holdco shall award to the Executive such number of Common Units (Incentive Profits Interest) as set forth in the separate Common Units (Incentive Profits Interest) Grant Agreement to be issued to the Executive by Holdco (the "Equity Award Agreement"). Such Common Units (Incentive Profits Interest) shall be subject to such vesting and other terms as set forth in the Equity Award Agreement and shall be consistent with the terms set forth on Exhibit C hereto.

Section 4. Term and Termination.

(a) *General*. The Employment Period shall commence on the Effective Date and shall end on December 31, 2024 (the "Initial Term"), and shall automatically renew annually thereafter for one (1) year terms (each a "Renewal Term"), unless and until either party provides sixty (60) days' advance written notice prior to the end of the Initial Term or the then-current Renewal Term that such party declines to so extend the Employment Period; provided, however, that the Employment Period shall terminate sooner upon the occurrence of any of the events set forth in clauses (b) through (d) below. The last day on which Executive is employed by the Company is referred to as the "Termination Date."

(b) *Termination by the Company*. The Employment Period may be terminated by the Company at any time with or without Cause (as defined below).

(c) *Resignation by the Executive*. The Executive may elect to terminate the Employment Period at any time. It is understood and agreed that if the Executive elects to terminate the Employment Period, then the Executive will provide the Company with at least sixty (60) calendar days' advance written notice.

(d) *Termination due to Death or Disability*. The Employment Period will be automatically terminated upon the Executive's death and may be terminated by the Company due to the Executive's Disability.

(e) *Definition of Cause*. For purposes of this Agreement, "Cause" means:

2

(i) the repeated failure by the Executive to follow the lawful directives as are reasonably requested in writing by the Board or the Chief Executive Officer of the Company;

(ii) gross negligence or willful misconduct by the Executive in the performance (or non-performance) of the Executive's duties;

(iii) a conviction of or a plea of guilty or nolo contendere by the Executive to a misdemeanor involving moral turpitude, fraud, embezzlement, theft, or other financial dishonesty, or to a felony;

(iv) any breach in any material respect by the Executive of (A) this Agreement, (B) the Equity Award Agreement, or (C) any other written agreement with the Demeter Companies;

(v) the violation in any material respect by the Executive of a written policy of the Company previously made available to the Executive; or

(vi) the violation by the Executive of a federal, state or local law relating to the Executive's own personal misconduct in the workplace (including sexual or other prohibited harassment).

The Company shall not be entitled to terminate the Executive's employment for Cause pursuant to clauses (i), (ii), (iv) or (v), unless the Company provides to the Executive written notice stating in reasonable detail the basis for termination and an opportunity of thirty (30) calendar days following the Executive's receipt thereof (a "Cure Period") to cure the same to the reasonable satisfaction of the Company (unless (x) the facts and circumstances underlying such termination are not able to be cured (in the reasonable determination of the Board) or (y) the Company has delivered a notice during the immediately preceding twelve (12) month period under the same clause of this Section 4(e) the facts and circumstances of which were cured; and in the case of either (x) or (y), the Company may terminate without providing an opportunity to cure); provided, however, that the Company, in its sole discretion, may put the Executive on paid administrative leave during all or a portion of a Cure Period. In addition, the Company shall not be entitled to terminate the Executive's employment for Cause pursuant to clause (vi) unless and until (i) the Company provides to the Executive written notice stating in reasonable detail the basis for termination, (ii) within ten (10) calendar days from the date of such notice the Executive provides the Board with a written explanation of why the circumstances giving rise to the condition on which the intended termination of the Executive is based should not constitute Cause under clause (vi) and (iii) the Board, after reviewing such explanation, determines that Cause still exists.

(f) *Definition of Disability*. For purposes of this Agreement, "Disability" means any long-term disability or incapacity which renders the Executive unable, with or without reasonable accommodation, to substantially perform the Executive's duties hereunder for two hundred ten (210) days during any twelve (12)-month period or one hundred eighty (180) consecutive days.

(g) *Definition of Good Reason*. For the purposes of this Agreement, "Good Reason" shall mean, unless otherwise agreed to in writing by Executive, the occurrence of one or more of the following conditions: (i) a material reduction in the Executive's Base Salary except

if such reduction is in connection with an across-the-board reduction in base salary applicable to all employees in comparable positions with the Company; (ii) a material diminution in Executive's authority, responsibilities or duties, other than (A) as a result of delegation by or at the direction of Executive to employees that report to Executive or (B) a requirement that the Executive report to a designee of the Chief Executive Officer; or (iii) any other material breach of the terms of this Agreement by the Company; provided however, that no termination shall be a termination for Good Reason unless Executive has given written notice to the Company of the existence of the condition above within thirty (30) days of the initial existence of the condition, the Company has had thirty (30) days to cure the condition and has not cured the condition, and Executive has terminated Executive's employment with the Company within thirty (30) days of the end of such cure period.

Section 5.    Payments Upon Termination.

(a)    *Accrued Obligations*.  Upon termination of the Executive's employment with the Company, regardless of the reason, the Executive (or the Executive's estate) shall be entitled to receive (i) the Executive's Base Salary through the Termination Date, (ii) reimbursement of eligible business expenses incurred prior to the Termination Date payable in accordance with the Company's policies, (iii) any non-forfeitable compensation and benefits to the extent earned through the Termination Date and (iv) other than if Employment Period is terminated by the Company for Cause or by the Executive without Good Reason, any unpaid Annual Bonus for the Company's fiscal year immediately preceding the Termination Date (the "Accrued Obligations").  For the avoidance of doubt, the Accrued Obligations other than the Annual Bonus shall be paid no later than thirty (30) days following Executive's termination of employment, in accordance with applicable law.  The Annual Bonus shall be paid during the Company's fiscal year in which Executive's employment was terminated at the same time that bonuses are paid to active employees.

(b)    *Severance Payments*.  If the Employment Period is terminated by the Company without Cause or by the Executive for Good Reason, then in addition to the Accrued Obligations, if the Executive executes within the time period established by the Company (which shall not exceed sixty (60) days), and does not revoke a general release of claims substantially in the form attached as Exhibit A hereto (a "Release"), then, subject to Section 7, the Executive shall be entitled to receive continued payments of Base Salary during the six (6) month period commencing on the Termination Date (the "Severance Payments"), to be made in substantially equal installments in accordance with the Company's regular payroll practices; provided that, the first installment shall be paid on the payroll date next following the sixtieth (60th) day after the Termination Date and shall include any amounts that would have otherwise been paid prior to such date.

(c)    *No Other Benefits*.  Except as otherwise required by law or as specifically provided herein, all of the Executive's rights to compensation and benefits as set forth herein shall cease upon the Termination Date.  The Executive agrees that the foregoing in this Section 5 represent the Executive's sole entitlements to compensation upon termination of employment with the Company and that the Executive shall not be entitled to any severance payments or benefits under any severance policy or practice maintained by the Demeter Companies.

Section 6. <u>Restrictive Covenants</u>. Reference is made to the non-competition, non-solicitation, non-disparagement, confidentiality and other covenants set forth in <u>Exhibit B</u> hereto and Equity Award Agreement, to the extent that the foregoing include such covenants (collectively, the "<u>Restrictive Covenants</u>"). The Executive agrees to comply with the Restrictive Covenants and acknowledges that the Company would not provide the Executive with the payments and benefits provided to the Executive in connection with the Closing Transactions or herein without the Executive agreeing to comply with the Restrictive Covenants.

Section 7. <u>Severance Payments</u>. If the Executive materially violates the Restrictive Covenants, then any Severance Payments thereafter due from the Company to the Executive pursuant to <u>Section 5(b)</u> shall be terminated forthwith and the Company's obligation to pay and the Executive's right to receive such Severance Payments shall terminate and be of no further force or effect, in each case without limiting or affecting the Executive's obligations under the Equity Award Agreement, or the Company's other rights and remedies available at law or equity.

Section 8. <u>Representations, Warranties and Additional Covenants of the Executive</u>.

(a) *Prior Employment*. The Executive hereby represents and warrants to the Company that the execution, delivery and performance of this Agreement by the Executive does not and shall not conflict with or violate any agreement to which the Executive is a party or any judgment to which the Executive is subject.

(b) *Cooperation*. After the Executive's termination of employment with the Company, Executive agrees to reasonably cooperate fully with reasonable requests in the handling or investigation of any administrative charges, government inquires or lawsuits involving any of the Demeter Companies that relate to matters that arose while the Executive was an employee of the Company. The Company will reimburse the Executive for any reasonable out-of-pocket expenses the Executive incurs by reason of such cooperation. The Company will make reasonable efforts to minimize any interruption to the Executive's personal and professional obligations in connection with the Executive's cooperation in such matters as provided for in this paragraph.

Section 9. <u>Notices</u>. Any notice pursuant to this Agreement must be in writing and will be deemed effectively given to the other party on the earliest of the date (a) three (3) business days after such notice is sent by registered U.S. mail, return receipt requested, (b) upon receipt, if such notice is sent by email (and each party agrees to promptly acknowledge receipt of the same to the party giving the notice by email), (c) one business day after delivery of such notice into the custody and control of an overnight courier service for next day delivery and (d) one business day after delivery of such notice in person; in each case to the appropriate address below (or to such other address as a party may designate by notice to the other party):

| | |
|---|---|
| If to the Company: | With a copy (which shall not constitute notice) to: |
| c/o Sterling Investment Partners<br>285 Riverside Avenue, Suite 300<br>Westport, CT 06880<br>Attention: Charles Santoro, Michael Barr and Dan Yu<br>E-mail: santoro@sterlinglp.com, barr@sterlinglp.com, and yu@sterlinglp.com | Norton Rose Fulbright US LLP<br>1301 Avenue of the Americas<br>New York, NY 10019<br>Attention: Roy Goldman<br>E-mail: roy.goldman@nortonrosefulbright.com |

If to the Executive, to the address for the Executive on file with the Company.

Section 10.    <u>General Provisions</u>.

(a)    *Severability*.  It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(b)    *Complete Agreement*.  This Agreement, together with the Equity Award Agreement, constitutes the entire agreement among the parties and supersede any prior correspondence or documents evidencing negotiations between the parties, whether written or oral, and any and all understandings, agreements or representations by or among the parties, whether written or oral, that may have related in any way to the subject matter of this Agreement.

(c)    *Successors and Assigns*.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the Executive and the Company and their respective successors, heirs, assigns, heirs, representatives and estate; <u>provided</u>, <u>however</u>, that the rights and obligations of the Executive under this Agreement shall not be assigned without the prior written consent of the Company in its sole discretion.  The Company may assign any or all of its respective rights and interests hereunder to one or more of Holdco or the Company's Affiliates or to a purchaser of all or substantially all of the Company's assets or business.  The rights of the Company hereunder are enforceable by Holdco or the Company's Affiliates, who are the intended third party beneficiaries hereof.

(d)    *Governing Law*.  This Agreement will be governed and construed in accordance with the domestic laws of the State of Florida without giving effect to any choice of law or conflicting provision or rule that would cause the laws of any other jurisdiction to apply.  The parties consent and submit to exclusive venue and personal jurisdiction in any federal or state court located in Miami Dade County, Florida, in any action, suit or proceeding arising out of or related to this Agreement or any of the transactions contemplated hereby.

(e) *Amendment and Waiver*.  The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and the Executive, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

(f) *Counterparts/Electronic Transmission*.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.  The parties agree that a facsimile or pdf signature attached to this Agreement shall be valid and binding as an original signature.

(g) *Withholding of Taxes*.  The Company may deduct and withhold from the compensation payable to Executive hereunder or otherwise any and all applicable federal, state, and local income and employment withholding taxes and any other amounts required to be deducted or withheld by the Company under applicable statute or regulation.

(h) *Compliance With Code Section 409A*.  This Agreement is intended to be interpreted so that the payments and benefits set forth herein shall either be exempt from or comply with the requirements of Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"); provided, however, that in no event shall the Demeter Companies be liable to the Executive for or with respect to any taxes, penalties or interest which may be imposed upon the Executive pursuant to Section 409A of the Code.  Each Severance Payment shall be treated as a right to a series of separate payments.  With respect to reimbursements and/or in-kind benefits not otherwise excludible from the Executive's gross income, to the extent required to comply with the provisions of Section 409A of the Code, (i) no reimbursement of expenses incurred by the Executive during any taxable year shall be made after the last day of the following taxable year of the Executive, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during a taxable year of the Executive shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, to the Executive in any other taxable year, and (iii) the right to reimbursement of such expenses shall not be subject to liquidation or exchange for another benefit.

(i) *WAIVER OF JURY TRIAL*.  NO PARTY TO THIS AGREEMENT OR ANY ASSIGNEE, SUCCESSOR, HEIR OR PERSONAL REPRESENTATIVE OF A PARTY SHALL SEEK A JURY TRIAL IN ANY PROCEEDING BASED UPON OR ARISING OUT OF THIS AGREEMENT.  NO PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION, IN WHICH A JURY TRIAL HAS BEEN WAIVED, WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED.  NEITHER PARTY HAS IN ANY WAY AGREED WITH OR REPRESENTED TO THE OTHER PARTY THAT THE PROVISIONS OF THIS SECTION WILL NOT BE FULLY ENFORCED IN ALL INSTANCES.

*[Signature page follows]*

SIGNATURE PAGE TO EXECUTIVE EMPLOYMENT AGREEMENT

FLORIDA VEG INVESTMENTS LLC

By:_____

Name:

Title:

DEMETER HOLDCO, LLC

By:_____

Name:

Title:

_____
Tony Smith

**Exhibit A**

**Form of Release of Claims**

I understand and agree completely to the severance payments ("Severance Payments") set forth in the Employment Agreement (the "Employment Agreement") dated September 1, 2023, by and among me, Florida Veg Investments LLC (the "Company") and Demeter Holdco, LLC ("Holdco").  I understand that I am not entitled to any severance payments if I do not sign this Release and return it to the Company on or before [Date to be inserted by the Company at the time of termination, which shall not exceed sixty (60) days from the Termination Date] pursuant to the terms set forth herein or if I revoke this Agreement as set forth in Section 3 below.  [REMAINING BLANKS TO BE COMPLETED BY THE COMPANY AT THE TIME OF RELEASE EXECUTION].

Section 1.   **General Release and Knowing Waiver of Employment-Related Claims**.  For and in consideration of the Severance Payments and any other benefits I am eligible to receive from the Company, I, on my own behalf and on behalf of my heirs, successors, representatives and assigns (collectively referred to as "Releasor"), hereby release and forever discharge the Company, Holdco, and their respective members, predecessors, successors, affiliates, officers, directors, agents, representatives, employees, consultants and advisors (collectively referred to as "Releasee"), from any and all claims, counterclaims, demands, debts, actions, causes of action, suits, expenses, costs, attorneys' fees, damages, indemnities, obligations and/or liabilities of any nature whatsoever, whether known or unknown, which Releasor ever had, now has or hereafter may have against Releasee from the beginning of the world to the date of this Release ("Claims"), to the extent relating to any of the following:

(a)   all such Claims directly or indirectly arising out of or in any way connected with my employment with the Company or the termination of that employment;

(b)   all such Claims related to salary, bonuses, commissions, stock options, profits interests, or any other equity incentive awards in the Company or any its Affiliates, vacation pay, fringe benefits, expense reimbursements, severance pay and/or any other form of compensation;

(c)   any Claims arising under any federal, state or local law, statute or ordinance, including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Americans With Disabilities Act, the Civil Rights Act of 1991, the Fair Labor Standards Act, the Equal Pay Act, the Employee Retirement Income Security Act of 1974, the Family and Medical Leave Act of 1993, and the Consolidated Omnibus Budget Reconciliation Act of 1985, all as amended, the anti-retaliation provisions of any federal or state statute, including state workers' compensation statutes, and any other applicable state or local statutes, including the [RELEVANT STATE STATUTES TO BE INSERTED]; and

(d)   any Claims for breach of contract, express or implied, including any claim for breach of any implied covenant of good faith and fair dealing, constructive discharge,

discrimination, harassment, fraud, retaliation defamation, intentional tort, emotional distress and negligence.

Notwithstanding the foregoing, nothing herein releases or waives (i) any Claim regarding the performance or non-performance of obligations arising under the Employment Agreement, (ii) my rights to receive my non-forfeitable accrued benefits (within the meaning of Sections 203 and 204 of ERISA) under any tax-qualified retirement plan maintained by the Company, (iii) any Claim which cannot be waived as a matter of law, including state workers' compensation benefits; (iv) my ability to apply for unemployment benefits, (v) my right to file an administrative charge or complaint with the Equal Employment Opportunity Commission or other administrative agency, although I waive any right to monetary relief related to such a charge or complaint, (v) any Claim regarding continued healthcare coverage pursuant to COBRA, and (vi) any right to defense and indemnification pursuant to the Company's governing documents or applicable law, or any directors and officers insurance policy maintained at any time by the Company or its Affiliates.

Also, Releasor does not release any claims against Releasee that may arise after this Release has become effective.

Section 2.  **Representation by Counsel and Review Period**.  I have been advised to consult independent legal counsel before signing this Release, and I hereby represent that I have executed this Release after having the opportunity to consult independent counsel [Note to draft:  If the employee is 40 or older, insert "and after considering the terms of this Release for twenty-one (21) days.  In the event of a reduction in force, insert "and after considering the terms of this Release for forty five (45) days] (although I may choose to voluntarily execute this Release earlier).  I further represent and warrant that I have read this Release carefully, that I have discussed it or have had reasonable opportunity to discuss it with my counsel, that I fully understand its terms, and that I am signing it voluntarily and of my own free will.

Section 3.  **Right to Revoke Release**.  This Release shall not become effective until the eighth day following the date on which I have executed it, provided that I have not revoked it, and I may at any time prior to that effective date revoke this Release by delivering written notice of revocation to [NAME AND CONTACT INFORMATION TO BE INSERTED].

Section 4.  **Consideration for Release**.  I acknowledge that the consideration for this Release is consideration to which I would not otherwise be entitled and is in lieu of any rights or claims that I may have with respect to any other remuneration from the Company.

Section 5.  **Representation Concerning Filing of Legal Actions**.  I represent that, as of the date of this Release, I have not filed, in respect of any of the Claims released pursuant to Section 1 hereof, any lawsuits, charges, complaints, petitions, claims or other accusatory pleadings against the Company or any of the other Releasees in any court or with any governmental agency.

Section 6.  **Continuing Obligations**.  I acknowledge and agree that I remain subject to the non-competition, non-solicitation, non-disparagement, confidentiality and other covenants set forth in the Equity Award Agreement by and between the Executive and Holdco dated [●]

and [ANY ADDITIONAL RESTRICTIVE COVENANTS TO BE INSERTED], each of which survive the termination of my employment.

Section 7.      **Amendment of Release**.  This Release may not be amended or modified except by a writing signed by _____, on behalf of the Company, and me.

Section 8.      **Governing Law**.  This Release shall be governed by and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws that would require application of any other law.

Section 9.      **Neutral Interpretation**.  This Release shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship of the Release.

Section 10.     **Headings**.  The various headings in this Release are inserted for convenience only and are not part of the Release.

Section 11.     **No Admission of Liability**.  Releasee agrees that this Release, and performance of the acts required by it, does not constitute an admission of liability, culpability, negligence or wrongdoing on the part of anyone, and will not be construed for any purpose as an admission of liability, culpability, negligence or wrongdoing by any party and/or by any party's current, former or future parents, subsidiaries, related entities, predecessors, successors, officers, directors, stockholders, agents, employees and assigns.

Dated:      This ____ day of _____, 20___.


_____
Tony Smith

**Exhibit B**

**Restrictive Covenants**

I.        Non-Disclosure and Non-Use of Confidential Information.

(a)        The Executive shall not, directly or indirectly, disclose or use at any time without the written consent of the Company, either during or after the Executive's period of service, any Confidential Information (as defined below) of which the Executive is or becomes aware, whether or not such information is developed by the Executive, except to the extent that such disclosure or use is directly related to the Executive's performance in good faith of duties assigned to the Executive by the Company. The Executive acknowledges that the Company's Confidential Information has been generated at great effort and expense by the Company and its predecessors and Affiliates and has been maintained in a confidential manner by the Company, its predecessors and Affiliates. The Executive will immediately notify the Company of any unauthorized possession, use, disclosure, copying, removal or destruction, or attempt thereof, of any Confidential Information by anyone of which the Executive becomes aware and of all details thereof. The Executive shall take all reasonably appropriate steps to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft. The Executive shall deliver to the Company on the date of the Executive's termination of employment, or at any time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof regardless of the form thereof (including electronic and optical copies)) relating to the Confidential Information or the Work Product (as defined below) which the Executive may then possess or have under his control.

(b)        As used in this Agreement, the term "Confidential Information" means information that is not generally known to the public and that is used, developed or obtained by the Company and any of its Affiliates (the "Covered Parties"), in connection with their businesses, including, but not limited to, information, observations and data obtained by the Executive while providing services to the Company concerning (i) the business or affairs of the Covered Parties, (ii) products or services, (iii) fees, costs and pricing structures, (iv) designs, (v) analyses, (vi) drawings, photographs and reports, (vii) computer software, including operating systems, applications and program listings, (viii) flow charts, manuals and documentation, (ix) data bases, (x) accounting and business methods, (xi) inventions, devices, new developments, methods and processes, whether patentable or unpatentable and whether or not reduced to practice, (xii) customers, clients, manufacturers and suppliers and customer, client and supplier lists, (xiii) other copyrightable works, (xiv) all production methods, processes, technology and trade secrets, (xv) business strategies, acquisition plans and candidates, financial or other performance data and personnel lists and data, and (xvi) all similar and related information in whatever form, unless the information is or becomes publicly known through lawful means.

(c)        Notwithstanding anything herein to the contrary, nothing herein shall prevent the Executive from (i) providing information to or participating in any investigation or proceeding conducted by any governmental agency, with or without notice to the Company (whether voluntarily, at the request of the agency or otherwise), (ii) reporting possible violations of law to any governmental agency, with or without notice to the Company, or receiving an award for providing such information or (iii) providing truthful testimony in response to a subpoena or

other judicial process. In the case of clauses (i) or (iii) above, unless otherwise prohibited by applicable law or otherwise directed by governmental representatives, the Executive agrees to provide the Company with prompt written notice of any request to provide testimony, along with a copy of any such request. In addition, pursuant to the Defend Trade Secrets Act of 2016, the Executive is notified that the Executive will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made: (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. The Executive is also notified that, in a lawsuit alleging retaliation by an employer for reporting a suspected violation of law, an individual may disclose the employer's trade secrets to the individual's attorney and use the trade secret information in the court proceeding if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

II. <u>Inventions and Patents</u>. The Executive agrees that all inventions, innovations, improvements, technical information, systems, software developments, methods, designs, analyses, drawings, reports, service marks, trademarks, trade names, logos and all similar or related information (whether patentable or unpatentable) which relates to the Covered Parties' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by the Executive (whether or not during usual business hours or on the premises of the Covered Parties and whether or not alone or in conjunction with any other person) while providing services to the Covered Parties (including those conceived, developed or made prior to the date of this Agreement) together with all patent applications, letters patent, trademark, tradename and service mark applications or registrations, copyrights and reissues thereof that may be granted for or upon any of the foregoing (collectively referred to herein as the "<u>Work Product</u>"), belong in all instances to the Covered Parties. The Executive shall promptly disclose such Work Product to the Board and perform all actions reasonably requested by the Board (whether during or after the Participant's period of service) to establish and confirm the Covered Parties' ownership of such Work Product (including, without limitation, the execution and delivery of assignments, consents, powers of attorney and other instruments) and to provide reasonable assistance to the Covered Parties in connection with the prosecution of any applications for patents, trademarks, trade names, service marks or reissues thereof or in the prosecution or defense of interferences relating to any Work Product. If any Covered Party is unable, after reasonable effort, to secure the signature of the Executive on any such papers, any executive officer of such Covered Party shall be entitled to execute any such papers as the agent and the attorney-in-fact of the Executive, and the Executive hereby irrevocably designates and appoints each executive officer of the Covered Parties as the Covered Parties' agent and attorney-in-fact to execute any such papers on the Executive's behalf, and to take any and all actions as any Covered Party may deem necessary or desirable in order to protect its rights and interests in any Work Product, under the conditions described in this sentence.

III. <u>Non-Competition, Non-Solicitation and Non-Disparagement</u>.

(a) The Executive agrees that for two (2) years following the Executive's termination of employment with the Company (the "<u>Restricted Period</u>") (subject to automatic extension by one day for each day that the Executive is in violation of this <u>Section III(a)</u>), the

Executive shall not, directly or indirectly, provide services (as an owner, manager, consultant, contractor, employee, agent or otherwise) to any person or entity engaged in the Business within the Restricted Territory other than the Company.  Nothing herein shall prohibit the Executive from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation which is publicly traded that is engaged in the Business, so long as the Executive has no active participation in the business of such corporation.

    (b)  For purposes of the Agreement and this <u>Exhibit B</u>:

      (i)  "<u>Business</u>" means the business of supplying and distributing fresh produce, dry goods and dairy and any other business, products or services of the Company as such businesses, products and/or services exist or are in the process of being formed or acquired during the Executive's period of service with the Company, with respect to which (A) the Executive is actively engaged or (B) the Executive has learned or received Confidential Information.

      (ii)  "<u>Restricted Territory</u>" means the geographic areas in which Executive performed job duties and responsibilities and/or learned Confidential Information about in the twenty-four (24) month period immediately preceding the Termination Date.

    (c)  During the Restricted Period (subject to automatic extension by one day for each day that the Executive is in violation of this <u>Section III(c)</u>), the Executive shall not directly or indirectly through another person or entity:

      (i)  solicit or induce any person who was an employee of the Covered Parties and (x) with whom Executive worked or (y) who had access to Confidential Information in the immediately preceding twenty-four (24) months of the Employment Period to leave the employ of the Covered Parties, or in any way interfere with the relationship between the Covered Parties, on the one hand, and any employee thereof, on the other hand, except that this <u>Section III(c)(i)</u> shall not apply to any (I) hiring as a result of any general solicitation (including through the use of search firms or otherwise) not directed at any such employees, or (II) common investment by the Executive on a passive basis with any such employee in any entity that is not engaged in the Business;

      (ii)  hire any person who was an employee of the Covered Parties and (x) with whom Executive worked or (y) who had access to Confidential Information in the immediately preceding twenty-four (24) months of the Employment Period, until twelve (12) months after such individual's employment relationship with the Covered Parties has terminated, except that this <u>Section III(c)(ii)</u> shall not apply to any hiring as a result of any general solicitation (including through the use of search firms or otherwise) not directed at any such employees; or

      (iii)  solicit or induce any customer, supplier, licensee, contractor or other business relation of the Covered Parties with whom the Executive had contact or about whom the Executive learned Confidential Information in the immediately preceding twenty-four (24) months of the Employment Period, to cease or reduce doing business with the Covered Parties, or in any way interfere or attempt to interfere with the relationship between any such customer, supplier, licensee, subcontractor or other business relation, on the one hand, and the Covered Parties, on the other hand.

(d) The Executive understands that the foregoing restrictions may limit the Executive's ability to earn a livelihood in a business similar to the business of the Covered Parties, but the Executive nevertheless believes that the Executive will receive sufficient consideration and other benefits from the Covered Parties to clearly justify such restrictions which, in any event given the Executive's education, skills and ability, the Executive does not believe would prevent such Executive from otherwise earning a living.

(e) The Executive shall inform any prospective or future employer that engages in the Business of any and all restrictions contained in this Agreement and provide such employer with a copy of such restrictions (but no other terms of this Agreement), prior to the commencement of that employment.

(f) The Executive agrees that the restrictions contained in this Section III are a part of this otherwise enforceable Agreement (including the enforceable promise to provide access to Confidential Information (including trade secrets) and access to customer goodwill). Additionally, the Executive agrees that the restrictions are reasonable and necessary, and do not impose a greater restraint than necessary to protect the Covered Parties' legitimate business interests. If, at the time of enforcement of Sections I through III, a court holds that the restrictions stated herein are unreasonable under the circumstances then existing, the Executive and the Covered Parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area so as to protect the Covered Parties to the greatest extent possible under applicable law. Further, if any particular provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision shall be ineffective without invalidating of affecting the enforceability of the remaining provisions of this Agreement. Nothing herein shall supersede, modify or otherwise affect the non-solicitation, non-competition and other restrictive covenants set forth in any other Agreement between the Executive and the Covered Parties.

(g) In order to protect the goodwill of the Covered Parties, subject to Section I(c) above, the Executive, both during and after the Executive's period of service, agrees not to publicly criticize, denigrate, or otherwise disparage any of the Covered Parties and each such entity's employees, officers, directors, consultants, other service providers, products, processes, policies, practices, standards of business conduct, or areas or techniques of research, manufacturing, or marketing.

IV. Enforcement. In the event of a breach or threatened breach of this Agreement by the Executive, the Covered Parties or their successors or assigns may, in addition to other rights and remedies existing in their favor at law or in equity, apply to any court of competent jurisdiction (without any requirement to post bond) for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof, as well as recover from the Executive any and all legally awardable damages, if and when final judgment of a court of competent jurisdiction is so entered against the Executive. The Company shall be entitled to recover its costs and reasonable attorneys' fees in the event that it prevails in whole or in part in the enforcement of any rights or obligations set forth in this Agreement.